

2014 MAR 10 AM 10: 32

# IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 69238-1-I |
| | ) | |
| Respondent, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | |
| JOHN SHELBY, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | FILED: <u>March 10, 2014</u> |

SPEARMAN, A.C.J. — John Shelby appeals his conviction on two counts of child molestation in the first degree, arguing that the trial court erred in admitting evidence that he molested his stepdaughter twenty-one years earlier to show a common scheme or plan, motive, and intent. In his statement of additional grounds for review, Shelby also argues that the prosecutor committed misconduct and violated his right to a fair and impartial jury, and that his counsel was ineffective in failing to respond appropriately. Finding no reversible error, we affirm.

## FACTS

When J.P. was four months old, she went to live with her aunt and uncle, LaTonya and John Shelby. J.P. referred to them as "mom and dad." Clerk's Papers (CP) at 4. On February 1, 2010, when J.P. was eight years old, a school official called CPS after noticing marks on J.P.'s body. When a Child Protective Services' (CPS)

social worker asked J.P. about the marks, J.P. said that LaTonya beat her with an extension cord.[1] CPS removed J.P. from her home and contacted law enforcement.[2]

On February 22, 2010, J.P.'s foster mother brought her to Dr. Naomi Sugar, director of the Center for Sexual Assault and Traumatic Stress at Harborview Medical Center, for an evaluation in connection with the physical abuse. In the course of interviewing J.P. about the physical abuse, Dr. Sugar asked J.P. whether "anyone had hurt her on her privates in a way she didn't like." 6 Verbatim Report of Proceedings (VRP) at 93. J.P. replied "just my dad when he was drinking too much, . . ." 6VRP at 94. Dr. Sugar asked J.P. what happened, and J.P. described at least two different incidents that allegedly occurred when J.P. was between six and eight years old.

One evening, six-year-old J.P. stayed up late watching television. After everyone else went to bed, Shelby brought J.P. into the kitchen. J.P. said Shelby "'pulled me through his knees, then he started to squeeze me with his legs.'" 6VRP at 94. He positioned her face down on the floor and got on top of her. She could "feel him on my butt going up and down." 6VRP 142. Both were fully clothed. CP at 184. J.P. said it felt "weird" and she "didn't like it." CP at 4. Afterwards, Shelby told J.P. not to tell her mom what happened. J.P. eventually disclosed the incident to her sister, and her sister told LaTonya. Later that evening, during a family bible study, Shelby apologized to J.P. and said he wouldn't do it again.

---

[1] We refer to Ms. Shelby by her first name, LaTonya, for clarity. No disrespect is intended.

[2] LaTonya pled guilty to assault of a child in the third degree in a separate proceeding, and is not a party to this appeal.

J.P. said it happened again when LaTonya went to visit family in Kansas City. J.P. was eight years old at that time. It was night, and J.P.'s sisters were upstairs. Shelby again took J.P. into the kitchen, laid her on the floor, got on top of her, and starting moving up and down. J.P. said she could feel "lumps, bumps that just goes down and up" against "my butt." 6VRP at 149.

Shelby was charged with two counts of child molestation in the first degree. Before trial, the State sought to admit evidence that Shelby had sexually molested his adult stepdaughter A.P. twenty-one years earlier.[3] This evidence included a transcript of A.P.'s witness statement, a transcript of an interview of A.P., and a transcript of an interview of A.P.'s grandmother, who corroborated A.P.'s version of events.

A.P. said the first incident happened shortly after Shelby married LaTonya and moved in with them. A.P. was around seven years old at that time. LaTonya was at nursing school during the day, and A.P. was out of school for the summer. A.P. went into the living room and started clearing the table where Shelby was sitting. Shelby pulled A.P. down on his lap and began moving her around. She could feel his erect penis against her bottom. A.P. was fully clothed and Shelby was wearing a red bathrobe. A.P. jumped up and went to her room. A.P. said it happened again on multiple occasions during the summer, when Shelby came home for lunch in the middle of the day. A.P. said Shelby took her into a back room, positioned her so she was straddling him in the front, then "danced" and rubbed his erect penis against her. Both

---

[3] A.P. did not live with J.P. She learned of J.P.'s allegations from her grandmother and a social worker after CPS removed J.P. from Shelby and LaTonya's home.

were fully clothed. Sometime later, A.P. disclosed the abuse to her grandmother, Shelby, and LaTonya. Shelby denied wrongdoing.

One night when A.P. was nine or ten, she woke up and felt someone touching her lower back. She turned around and saw Shelby sitting on her bedroom floor in his underwear. Shelby said, "'don't tell your mom'" and walked away. 6VRP at 178. A.P. told her mother, who said she would "take care [of] the situation." CP at 138. No further sexual abuse incidents occurred after that. The family did not report any of these incidents to law enforcement.

The trial court found that the prior misconduct described by A.P. had been proven by a preponderance of the evidence. The court then ruled that evidence of Shelby's prior sexual abuse of A.P. was admissible under ER 404(b) to show common scheme or plan, motive, and intent. J.P., A.P., and A.P.'s grandmother testified at trial. Shelby did not testify. The trial court gave a limiting instruction regarding the testimony of A.P. and her grandmother, as Shelby requested. The jury returned a guilty verdict on both counts, and the trial court imposed a standard range sentence. Shelby appeals.

## ANALYSIS

Shelby argues that the trial court committed reversible error by admitting evidence of prior uncharged incidents of sexual misconduct with A.P. to show a common scheme or plan. He contends that this evidence was improperly used for the forbidden purpose of demonstrating his propensity to commit such crimes, and that it was more prejudicial than probative. We disagree.

ER 404(b) prohibits a court from admitting "[e]vidence of other crimes, wrongs, or acts . . . to prove the character of a person in order to show action in conformity therewith." "A trial court must always begin with the presumption that evidence of prior bad acts is inadmissible." State v. DeVincentis, 150 Wn.2d 11, 17, 74 P.3d 119 (2003). Such evidence "may, however, be admissible for any other purpose, depending on its relevance and the balancing of its probative value and danger of unfair prejudice" State v. Gresham, 173 Wn.2d 405, 420, 269 P.3d 207 (2012). "If the evidence is admitted, a limiting instruction must be given to the jury. . . ." Foxhoven, 161 Wn.2d 168, 175, 163 P.3d 786 (2007).

"One proper purpose for admission of evidence of prior misconduct is to show the existence of a common scheme or plan." Gresham, 173 Wn.2d at 420. "Proof of such a plan is admissible if the prior acts are (1) proved by a preponderance of the evidence, (2) admitted for the purpose of proving a common plan or scheme, (3) relevant to prove an element of the crime charged or to rebut a defense, and (4) more probative than prejudicial." State v. Lough, 125 Wn.2d 847, 852, 889 P.2d 487 (1995).

We review the trial court's decision to admit evidence under ER 404(b) for abuse of discretion. Foxhoven, 161 Wn.2d at 174. Discretion is abused if it is exercised on untenable grounds or for untenable reasons. State ex rel. Carroll v. Junker, 79 Wn.2d 12, 26, 482 P.2d 775 (1971).

The trial court did not abuse its discretion in finding that A.P.'s testimony was admissible to show common scheme or plan. "Evidence of past acts may be admissible to show a common scheme or plan where the prior acts demonstrate a single plan used

repeatedly to commit separate but very similar crimes." State v. Sexsmith, 138 Wn. App. 497, 504-05, 157 P.3d 901 (2007). "Such evidence is relevant when the existence of the crime is at issue." DeVincentis, 150 Wn.2d at 21. The prior misconduct and the charged crime must show "such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations." Lough, 125 Wn.2d at 855 (internal citations omitted). Where identity is not at issue, a unique method of committing the crimes is not required. DeVincentis, 150 Wn.2d at 21.

Here, the evidence showed marked similarities between Shelby's abuse of A.P. and J.P. Shelby was in a position of authority over both girls. He was A.P.'s stepfather and the primary father figure for J.P. since she was an infant. Both girls were about the same ages when Shelby molested them. And both girls said that Shelby brought them to a certain room and molested them by holding them in a certain position and rubbing his penis against them while fully clothed.

Shelby further argues that the evidence is inadmissible as a common scheme or plan because A.P.'s unreported allegations took place twenty-one years earlier. We acknowledge that "the lapse of time may slowly erode the commonality between acts and reduce the relevance of the prior acts." State v. DeVincentis, 112 Wn. App. 152, 162, 47 P.3d 606 (2002). However, this factor is not determinative. The "time lapse between the prior bad act and the present one affects weight rather than "the admissibility of the evidence." State v. Evans, 45 Wn. App. 611, 617, 726 P.2d 1009 (1986). The trial court did not abuse its discretion in concluding that Shelby's actions

were admissible as individual manifestations of a common scheme or plan to sexually molest young girls in his care.[4]

Shelby also contends that the probative value of this evidence was substantially outweighed by extreme prejudicial effect. Although the elapsed time weighs against admission, other factors present in this case strongly favor admissibility. "The purpose of ER 404(b) is to prohibit admission of evidence designed simply to prove bad character; it is not intended to deprive the state of relevant evidence necessary to establish an essential element of its case." Lough, 125 Wn.2d at 859. Because there was no physical evidence that J.P. was sexually molested and no other witnesses to the events she described, the State's case rested on the testimony of J.P., A.P., and A.P.'s grandmother. J.P.'s credibility was the central issue. "Generally, courts will find that probative value is substantial in cases where there is very little proof that sexual abuse has occurred, particularly where the only other evidence is the testimony of the child victim." Sexsmith, 138 Wn. App. at 506. It is not unusual for Washington courts to uphold evidence of prior bad acts in child sexual abuse cases, even where the elapsed time between the prior acts and the charged crime is substantial. See DeVincentis, 112 Wn. App. at 161 (15 years); State v. Baker, 89 Wn. App. 726, 734, 950 P.2d 486 (1997) (11 to 15 years); State v. Krause, 82 Wn. App. 688, 691-92, 919 P.2d 123 (1996) (14 or

---

[4] See Sexsmith, 138 Wn .App. at 505 (evidence showed common scheme or plan when defendant was in position of authority, isolated girls of the same age, and forced them to perform similar sex acts); State v. Kennealy, 151 Wn. App. 861, 888-889, 214 P.3d 200 (2009) (common scheme or plan where prior acts of molestation occurred with defendant's young daughter and nieces and were substantially similar to charged crimes); Gresham, 173 Wn.2d at 422-23 (slight differences in details between prior bad acts and charged crimes did not outweigh common occurrence of fact with remaining details).

more years). We also note that the trial court minimized the danger of unfair prejudice by giving a limiting instruction to the jury. The trial court did not abuse its discretion in concluding that the probative value of this evidence outweighed the prejudicial effect.[5]

Shelby raises two additional issues in his statement of additional grounds for review, both arising from the same event. On June 5, 2012, the prosecutor told the court that a member of her office staff had received a phone call from the staff member's mother, who had been one of the potential jurors on this case, but who had been released. The call was about Juror No. 37, who was excused for cause, on motion of Shelby's counsel, during individual voir dire. The caller reported that while they were in the jury room, Juror No. 37 "expressed complete disdain for the State, went so [sic] to far as calling all prosecutors liars, that they bring cases without evidence, that they bring cases on false accusations." 3VRP at 2. The prosecutor stated that she had discussed the situation with defense counsel, and that they agreed to ask the court to strike the jury panel and begin anew.

Shelby argues that the prosecutor committed misconduct and violated his Sixth Amendment right to a fair and impartial jury by accepting a phone call from a potential juror and asking the court to strike the entire jury pool. To establish a claim for prosecutorial misconduct, the defendant bears the burden of showing that the prosecutor's conduct was both improper and prejudicial. State v. Magers, 164 Wn.2d 174, 191, 189 P.3d 126 (2008). Shelby has not made this showing. The record

---

[5] Shelby also argues that the trial court erred in concluding that the evidence was admissible under ER 404(b) to prove motive and intent. Because we conclude that the evidence was admissible to prove common scheme or plan, we need not address these arguments.

demonstrates that the prosecutor did not communicate directly with a juror. Rather, she received a call from a member of her office staff, who had obtained information about events that occurred in the jury room. The prosecutor promptly reported the incident to the trial court. The prosecutor's actions were not improper. Moreover, the prosecutor's actions were not prejudicial. Both the federal and state constitutions provide a criminal defendant the right to trial by an impartial jury. U.S. Const. amend. VI; Wash. Const. art. I, §22 (amend. x). And Shelby does not contend that the jury that actually heard the trial was biased in any way. Moreover, even if Shelby preferred to retain the first jury panel, "[a] defendant has no right to be tried by a particular juror or by a particular jury." State v. Gentry, 125 Wn.2d 570, 615, 888 P.2d 1105 (1995).

Shelby further argues that he received ineffective assistance of counsel because his attorney did not heed his request to challenge the prosecutor's motion or ask for an evidentiary hearing to determine what happened in the jury room. To demonstrate ineffective assistance of counsel, a defendant must show that defense counsel's representation was deficient and that counsel's deficient representation caused prejudice. State v. MacFarland, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). We presume that counsel's representation was effective. State v. Hendrickson, 129 Wn.2d 61, 77, 917 P.2d 563 (1996). The presumption can be overcome by a showing that counsel's "representation was unreasonable under prevailing professional norms and that the challenged action was not sound strategy." In re Davis, 152 Wn.2d 647, 673, 101 P.3d 1 (2004) (quoting Kimmelman v. Morrison, 477 U.S. 365, 384, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986)).

Shelby has not met this standard. "Under the laws of Washington, the right to a jury trial includes the right to an unbiased and unprejudiced jury." State v. Davis, 141 Wn.2d 798, 824, 10 P.3d 977 (2000) (citing State v. Parnell, 77 Wn.2d 503, 507, 463 P.2d 134 (1969)). When the prosecutor moved to dismiss the jury panel, defense counsel told the court that she agreed Juror No. 37's comments may have tainted the jury pool to the possible detriment of both parties. Her response was a reasonable tactical decision. Furthermore, Shelby's desire for an evidentiary hearing does not mandate a different result. Differences of opinion regarding trial strategy or tactics will not support a claim of ineffective assistance. State v. Lord, 117 Wn.2d 829, 883, 822 P.2d 177 (1991).

Affirmed.

_Spearman, A.C.J._

WE CONCUR:

_Cox, J._                    _Becker, J._